[Crim. No. 7166.   Second Dist., Div. Three.   Feb. 3, 1961.]

THE PEOPLE, Respondent, v. CHARLES AUGUSTUS BLANCK et al., Appellants.

John H. Marshall for Appellants.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SHINN, P. J.—By information Richard Gach and Charles Blanck were accused in Count I of conspiring with Kenneth Godkins and others to violate Penal Code, sections 337a and 337b; in Count II Gach was charged with offering a bribe to Mooneyhan, a jockey, and in Count III with offering a bribe to Topham, a jockey, the offenses allegedly occurring on September 23, 1958 (Pen. Code, § 337b); in Counts IV and V Gach and Blanck were jointly accused of two offenses of receiving money to be bet on a horse race on or about October 17, 1958, and February 6, 1959. (Pen. Code, § 337a, subd. 3.) Upon motion under Penal Code, section 995, Counts IV and V were dismissed as to Blanck; upon the People's motion Count V was dismissed as to Gach. In a jury trial both defendants were found guilty of conspiracy; Gach was found guilty of Counts II, III and IV; both were sentenced to one year in the county jail and they appeal from the judgment.

The sole contention of appellants is that the only substantial evidence against them was the uncorroborated testimony of witnesses who were accomplices, principally Godkins, a former jockey, who was jointly accused with appellants but turned state's evidence and obtained dismissal of the charges. We have concluded that there was no evidence sufficient to corroborate the testimony of the accomplice witnesses with respect to Blanck and that the judgment as to him must be reversed. As to Gach, we have come to the conclusion that there was sufficient corroborative evidence on the charges of conspiracy (Count I) and of receiving a bet (Count IV) but there was not sufficient corroboration on the Counts II and III of offering a bribe to a jockey.

The record is voluminous. Appellants did not testify. The substance of the People's evidence will be stated and the matter of corroboration will be discussed later.

Kenneth Godkins was the chief witness for the People. Godkins testified that he met Gach at the Los Angeles County

Fairgrounds in Pomona shortly before the racing meeting opened in September 1958 and after several conversations he agreed to assist Gach and one Gil Rubello in obtaining "front money" from gamblers, among them a Mrs. Ella Kurth. "Front money" is money paid in return for the name of a horse which is supposed to win a particular race. Gach, Godkins, Rubello and Mrs. Kurth met in Godkins' room at the Holiday Inn Motel several days later. Mrs. Kurth agreed to advance between $800 and $1,000 to fix a race; Rubello was to deliver the money to Gach; Godkins was to offer the jockeys a $200 win ticket on the horse he and Gach selected as the winner; Gach was to exhibit the money to the jockeys in an open racing program as they rode past the grandstand. After Rubello and Mrs. Kurth left the room Gach told Godkins that they would retain the money instead of distributing it to the riders. Having received the money from Rubello the following day they bet it on a horse and lost.

Five or six days after the meeting commenced Godkins and Gach paid a visit to Mrs. Kurth's apartment in Long Beach. Gach asked Mrs. Kurth to advance $2,500, of which $1,600 would be used to purchase win tickets for jockeys who were to be persuaded not to use their best efforts. Mrs. Kurth made a telephone call to one Lloyd Brown who brought over the money and handed it to Mrs. Kurth, who gave it to Gach. Gach said that they would telephone her later and give her the name of a winner. On the way back to the racetrack Godkins and Gach split the money and decided to "buy" two races. They selected Tambien in the eighth race and Godkins told a number of jockeys that if Tambien won he would give them some money. Godkins bet $800; Gach bet $700; Tambien won. They then selected Sully Sez in the last race and Godkins spoke to a number of riders. They bet their previous winnings on Sully Sez and fortune favored them. That evening and the next day Godkins and Gach paid off some jockeys, including one Glen Laswell, but no part of her $2,500 was ever returned to Mrs. Kurth. Around September 23rd Godkins received a $400 Western Union money order from Mrs. Kurth and gave her the name of a horse over the telephone.

On September 23rd Godkins met Gerald Carpenter at the fairgrounds in the company of an old friend, John Fitzgerald. Carpenter gave him $450 or $500 in return for the name of the winner of the last race. Godkins gave half of the money to Gach, who selected a horse named Davey. Godkins talked to three jockeys, Buddy Mooneyhan, Arrel Topham and Gil

Hernandez before the race. He told them he would give each of them some money and a $200 bet if they would do business with him, which they agreed to do; each promised not to make his best effort in the race. But after talking to the jockeys Godkins decided to back Zac-A-Win rather than Davey, disclosed his intention to Gach and bet $1,000 on Zac-A-Win for himself and the jockeys. Davey won the race, and when Godkins, Gach, Carpenter, Fitzgerald and Blanck met after the close of the meeting at the Holiday Inn, Godkins and Gach explained that they had been double-crossed.

Godkins was introduced by Carpenter to a Mr. and Mrs. Arnold Karr, who managed an apartment house. After several preliminary conversations Mrs. Karr offered Gach and Godkins the free rental of an apartment in return for a winning horse. During a subsequent conversation with the Karrs in the presence of the latters' son and daughter-in-law, Godkins and Gach accepted $250 in return for the name of a horse. They said they would go to San Francisco and try to fix a race. The Karrs were eventually given the name of a horse, but no attempt was made to fix the race and the horse lost. Godkins was informed by Carpenter that the Karrs wanted their money back; neither Gach nor Godkins wanted to return the money personally; Gach said he would give the $250 to Blanck for delivery to the Karrs, but the Karrs would have to sign a receipt for the money stating that it was in repayment of a loan.

On October 17th Godkins and Fitzgerald persuaded Carpenter to advance $1,000 to help fix a race at a track in northern California. Carpenter obtained the money from the bank and accompanied Godkins to the telegraph office, where it was wired to Godkins in San Bruno. Godkins explained that the money would match $1,000 Fitzgerald had in San Francisco and would be used to bribe jockeys and secure a winner. The following day Godkins returned to the telegraph office and had the money wired back; he gave half of it to Gach. When he told Gach that they were supposed to go to San Francisco to fix a race Gach said that if they did not go they would keep the money and simply pick a horse. Godkins subsequently asked Carpenter for an additional $1,000 to be used in fixing another race. Carpenter gave the money to Fitzgerald, who drove to San Francisco with Gach and Godkins. The money was understood to be Carpenter's personal bet. The three men selected a horse, bet the $1,000 and lost. They made no attempt to fix the race.

During the racing season at Pomona, Gach introduced Godkins to one Emil Kay, a bartender at the Holiday Inn. In December Kay gave Gach his check for $1,000 to be bet on a winning horse in San Francisco. Gach endorsed the check to Godkins, who cashed it and divided the proceeds with Gach. However, Kay stopped payment on the check.

In January 1959, Godkins, Gach and Laswell, the jockey, went to San Diego for the purpose of fixing a race at the Caliente racetrack. On January 25th, Laswell went to the track but returned and told Godkins not to bet on the horse they had selected as the rider of Allied was planning to win and the other jockeys intended to see that he did. Godkins discussed the matter with Gach and they decided to bet on Allied; Blanck was nearby during the conversation but did not participate; money was bet on Allied, which won the race; Godkins and Gach received a substantial sum.

Although Godkins was the main witness, all the persons mentioned in our summary of his testimony were called to the stand save Fitzgerald and Hernandez. For the most part they described the same events and conversations already related by Godkins. As we shall point out subsequently, some were accomplices and their testimony was worthless as corroboration of Godkins or of one another. Others were accomplices as to the conspiracy but not as to a particular substantive offense. Still others were not accomplices at all. Our statement of the additional evidence will accordingly be restricted to accomplice testimony which sheds additional light on that of Godkins and to the testimony of those witnesses who were not guilty participants in any of the offenses.

Mrs. Kurth testified that Rubello was her bookie, and she, Rubello and one Sponseller described their meeting with Gach and Godkins at the Holiday Inn, their agreement to put up money to fix races, their efforts to raise the money and their subsequent fortunes. Mrs. Kurth also testified that she had her brother wire the $400 to Godkins on September 23rd. Laswell, the jockey, testified that he demanded and received a payoff from Godkins after the Tambien race, having agreed to "play along" with him, although he also testified that he "rode hell" out of his own horse all the way.

In addition to describing the melancholy series of events which lost him several thousand dollars, Carpenter testified that he went with Blanck to return the $250 which Godkins and Gach had obtained from the Karrs and that before giving

them the money Blanck insisted that they sign a receipt stating that the money was a loan.

Of greater significance was the testimony of Mr. and Mrs. Arnold Karr. They related the conversation with Godkins and Gach as previously described by Godkins. It was their understanding that the money they were to advance would be used to buy a $100 win ticket for each jockey in the race to be fixed. Their description of the meeting with Blanck was similar to Carpenter's. Mrs. Karr testified in addition that she and her husband went to Caliente on January 25th at Blanck's suggestion to bet on a fixed race; Blanck was to receive half of her winnings; Blanck told her before the 11th race that the winning horse would be Allied; she bet on the horse; it won the race; and she paid $140 of her winnings to Blanck the following day. Mr. Karr gave similar testimony.

Testimony was also adduced from J. Lloyd Brown, a friend of Mrs. Kurth, Glen Rhoades, her brother, the jockeys Mooneyhan and Topham, Raymond Karr, the son of Mr. and Mrs. Karr, and C. A. Pantaleoni, an investigator for the district attorney's office.

Brown testified that Mrs. Kurth called him on September 19th and asked for $2,500. He obtained the money and brought it to her apartment, where he was introduced to Godkins and Gach. He handed the money to Mrs. Kurth, who counted it and gave it to Godkins and Gach. Brown had heard that Mrs. Kurth was interested in horse racing.

Rhoades testified that he drove Mrs. Kurth to the Holiday Inn on two occasions in September, meeting Gach and Godkins on the second trip. Nothing was said about horses in his presence. On September 23rd, Mrs. Kurth sent him to the telegraph office in Long Beach to wire $400 to Godkins at the Western Union office in Pomona, which he did.

Topham rode Zac-A-Win in the twelfth race at Pomona on September 23rd. He testified that he had a conversation with Godkins before the race. Godkins told him that $200 would be bet for him on Davey if he got Zac-A-Win beaten; the witness refused. Godkins contacted him again before the race and said he would bet on Zac-A-Win and would place a $200 bet for Topham; Topham said he did not care and was going to win. Although the horse failed to win, Topham tried very hard to do so. Topham also testified that he had seen Gach and did not know him personally but he knew that Gach was Godkins' agent.

Mooneyhan was riding Valiant Ace in the twelfth race.

Godkins spoke to him before the race and made the same proposition that he made to Topham, which Mooneyhan rejected. A minute or two before the race Godkins approached him again and said something about going with Zac-A-Win as the likely winner. Mooneyhan did not know Gach.

Raymond Karr testified that he saw Gach and Godkins at his mother's apartment on several occasions in September and October. One evening in October, he overheard a conversation between his mother and the two men. Godkins told Mrs. Karr that he wanted a thousand dollars for betting on a race, which Mrs. Karr said she did not have. Godkins then said he would accept $500 and six months' free rent. Mr. Karr arrived and joined the conversation. Mrs. Karr said that she and her husband had $250 and Godkins agreed to accept it, stating that Gach had to fly immediately to San Francisco with the money and that the race was fixed. Godkins produced a slip of paper which he described as a telegram or receipt for $1,000 which he claimed to have sent to San Francisco, whereupon Mr. and Mrs. Karr gave him $250 in cash which he handed to Gach.

Pantaleoni testified that he had several conversations with Blanck after the latter's arrest on March 25, 1959. Blanck's statements were free and voluntary. Blanck said that he met Gach at the Pomona racetrack and had seen him there several times. Gach introduced him to Godkins and he saw the two men frequently in October or November. The two men asked him to return some money to Mr. and Mrs. Karr. When he visited the Karrs, accompanied by Carpenter, he told them he would give them the money in return for a receipt stating that it was a loan. He had heard that the Karrs had made some arrangement on a race horse or racing but had received no return on their investment. Mr. and Mrs. Karr and Carpenter signed the receipt, whereupon he handed over the money. Pantaleoni testified further: "I then asked Mr. Blanck if he had ever been down or had any other dealings down to Caliente or had any other dealings with the Karrs and at this time he stated that he would figure that he was in enough of a jackpot and he would just as soon talk to an attorney. I told him that that would be all right and he wanted to call his wife at this time and I also told him that that would be all right as soon as our interview was at an end. I then informed him for the record that I would have to ask him certain questions but that he would feel free not to answer them and then he would be entitled to an attorney. I asked him if it wasn't

true that he had gone down to Caliente on January 25th, 1959, and met the Karrs there and discussed a race with Allied as a winner and his answer was, 'I pass.' And then the interview continued another few minutes and then it terminated.''

We turn now to the question of corroboration.

The parties assume that Godkins, Sponseller, Rubello, Carpenter, Laswell, Mary Karr, Arnold Karr and Ella Kurth were members of the conspiracy charged in Count I and that Godkins, Carpenter, and Mrs. Kurth participated either as principals or accessories in offering a bribe as charged in Counts II and III to the jockeys, Topham and Mooneyhan. We have already indicated that we do not disagree with these assumptions. The parties have also assumed that Mr. and Mrs. Karr were liable as participants in the offense of receiving money to be wagered, as charged in Count IV. With this assumption we cannot agree. However, we will point out the status of the Karrs at a later point in our opinion.

The rules respecting corroboration may be stated as follows: Evidence offered to corroborate the testimony of an accomplice is sufficient if it tends to connect the accused with the commission of the crime in such a way as may reasonably satisfy the trier of fact that the accomplice is telling the truth.

It must be considered without the aid of the testimony which is to be corroborated, and is insufficient if it requires the interpretation and direction of such testimony in order to give it value. (*People* v. *Lyons,* 50 Cal.2d 245 [324 P.2d 556].) Corroborating evidence need not be direct but may be circumstantial. It need not extend to all the elements of the offense, nor to every detail included in the testimony of the witness to be corroborated, and it has been held that it is sufficient if it tends, in some slight degree, to implicate the accused. (*People* v. *Griffin,* 98 Cal.App.2d 1, 24-6 [219 P.2d 519], and cases cited.)

In considering the sufficiency of the evidence to corroborate the accomplice testimony implicating Gach we will discuss first the evidence relating to Counts I and IV, upon which we are convinced the corroboration was sufficient.

It cannot be doubted that the testimony of Godkins, if believed by the jury and corroborated by independent evidence, was sufficient to establish Gach's participation in a conspiracy to violate the bookmaking statute by receiving money to be wagered and by offering bribes to jockeys. If there was corroboration of the testimony of Godkins upon the conspiracy count, it is immaterial whether there was corrobora-

tion of the testimony of Sponseller, Rubello, Carpenter, Laswell, or Mrs. Kurth.

The testimony of Raymond Karr provided sufficient corroboration of Godkins as to Count I. Standing alone, and without reference to the testimony of any other witness, his description of the conversation between his parents, Gach and Godkins, amply confirmed Godkins' testimony that he and Gach were engaged in "buying" horse races by receiving money from gamblers and using it to place bets for specific jockeys on horses whose triumphs were arranged in advance.

■ Upon Count IV, the charge of receiving money to be wagered on or about October 17, 1958, the testimony of Godkins was sufficiently corroborated by Mr. and Mrs. Karr and their son, Raymond. We have already indicated that although the elder Karrs were members of the conspiracy they were not accomplices of Godkins in that transaction. This is for the reason that the person who places a bet is chargeable with a separate and distinct offense. (Pen. Code, § 337a, subd. 6; *People* v. *Grayson,* 83 Cal.App.2d 516 [189 P.2d 285].) We need say of the Karrs' testimony no more than that it established the receipt by Gach of $250 to be wagered on a race in San Francisco shortly after Godkins mailed to San Bruno the $1,000 he had received from Carpenter on October 18th.

■ We have next to consider whether there was evidence apart from the testimony of Godkins and his fellow conspirators to incriminate Gach in the attempt to bribe Mooneyhan and Topham, as charged in Counts II and III. In our opinion, there was not. It was a reasonable inference that the $400 advanced by Mrs. Kurth on September 23rd was to be used for bribery, but Rhoades, who wired the money order, testified that he sent it to Godkins. The two jockeys were called to the stand and each denied having accepted a bribe. Mooneyhan testified that he did not know Gach; Topham testified that he had seen Gach at the track and that he knew Gach was Godkins' agent, but his testimony disclosed that he had no dealings with Gach. The evidence of Rhoades and Mooneyhan does not tend in the slightest to establish Gach's guilt of offering a bribe and the testimony of Topham raises no more than a faint suspicion that Gach was concerned in the attempted bribery. ■ It is settled that corroboration is insufficient when it merely casts suspicion upon the accused. (*People* v. *Kempley,* 205 Cal. 441, 456 [271 P. 478], and cases cited.)

The People argue nevertheless that corroboration of Godkins is to be found in the fact that Gach's participation in the conspiracy was established by the testimony of Raymond Karr, who was not an accomplice, together with the assertion that once the conspiracy was proved, Godkins' acts were to be imputed to Gach by operation of law. The argument is without merit. It is true that there was sufficient evidence to corroborate Godkins as to a conspiracy to make bets, but there was no corroboration with respect to the plan to bribe jockeys. The rule that one conspirator is liable for the acts of another conspirator in furtherance of their agreement does not apply. The acts of Godkins could not furnish corroboration of his testimony.

We have finally to consider the matter of corroboration as to Blanck.

The only evidence suggested as corroboration is the testimony of the investigator Pantaleoni, whose conversation with Blanck we have quoted at some length. It is argued that the statements of Blanck to the officer constituted admissions by him which were sufficient to corroborate the testimony of Godkins and the other conspirators. We think the testimony of Pantaleoni was insufficient as corroboration. It gave rise to only a slight suspicion that Blanck was associated with the others for the purpose of fixing races and receiving bets. The statements made by Blanck to the officer indicated merely that he was associated with Godkins and Gach and returned some money to the Karrs. Although Blanck admitted that he asked them to sign a receipt to the effect that the money was a loan the statement cannot be deemed an admission of guilt unless it is considered together with the testimony of Mr. and Mrs. Karr, who were accomplices. Blanck also replied "I pass" when asked by Pantaleoni if he had discussed a race at Caliente with the Karrs. It will be recalled that this incident occurred immediately after the investigator told him he need not answer any questions and that he would be entitled to an attorney. It is beyond question that Blanck's answer was not the type of evasion that admits guilt but an exercise of his right to refuse to answer questions that might tend to incriminate him.

As to Gach, the judgment is reversed as to Counts II and III and affirmed as to Counts I and IV; as to Blanck the judgment is reversed.

Vallée, J., and Ford, J., concurred.